ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>RECURRIDO<br><br>V.<br><br>MIGUEL ENRIQUE MÉNDEZ PÉREZ<br><br>RECURRENTE | KLRA202500309 | *REVISIÓN JUDICIAL* procedente de la Oficina de Ética Gubernamental<br><br>Caso Número: 21-39<br><br>Sobre:<br>Violación al Inciso (b), del Artículo 4.2 de la, Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, Según Enmendada |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Alvarez Esnard, y la jueza Prats Palerm

**Brignoni Mártir, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 18 de julio de 2025.

Comparece ante nos, Miguel Enrique Méndez Pérez (en adelante, el "recurrente"). A los fines de solicitar nuestra intervención para que dejemos sin efecto la "*Resolución*" emitida el 31 de marzo de 2025 y notificada el 1 de abril de 2025 por la Oficina de Ética Gubernamental (en lo sucesivo "OEG"). Mediante la referida *"Resolución,"* el Director Ejecutivo de la OEG adoptó en su totalidad el *"Informe de Oficial Examinador."* Así pues, determinó que el recurrente violentó la disposición ética recogida en el Artículo 4.2(b) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, según enmendada, 3 LPRA sec. 1857a. En consecuencia, le impuso al recurrente una sanción de $3,000.00.

Por los fundamentos que expondremos a continuación, *confirmamos* la *"Resolución"* recurrida.

### I.

El 25 de abril de 2023, la OEG presentó la "*Querella*" de epígrafe. Sostuvo que el recurrente incurrió en violaciones éticas al momento de ejercer el puesto de alcalde del Municipio de Isabela. Alegó que el 1 de abril de 2021, el recurrente otorgó un contrato de servicios de consultoría en el que el señor Wilfred Yasel Torres Rosado ("señor Torres Rosado"),

prestaría servicios al municipio en calidad de consultor.[1] Adujo, que, para la referida fecha, el señor Torres Rosado era legislador municipal del Municipio de Aguadilla, dado que juramentó para el puesto el 11 de enero de 2021 y finalizó dicho cargo el 6 de julio de 2021, fecha en que efectuó su renuncia. Arguyó que la referida contratación se realizó en contravención del Artículo 1.023 del Código Municipal de Puerto Rico, Ley Núm. 107-2020, según enmendada, 21 LPRA sec. 7044.

Sobre la referida infracción, sostuvo que el Municipio de Isabela y el Municipio de Aguadilla formaban parte de un mismo consorcio denominado como el "Consorcio del Noroeste." En vista de lo anterior, arguyó que por disposición del Artículo 1.023, *supra*, legisladores municipales tienen prohibido entablar relaciones contractuales con los otros municipios adscritos al mismo consorcio. Ante ello, alegó que el recurrente utilizó las facultades de su cargo para otorgar un contrato a favor del señor Torres Rosado en contravención de la ley, y sin peticionar la autorización correspondiente. Por consiguiente, adujo que el recurrente infringió el Artículo 4.2(b), *supra*. En virtud de lo expuesto, solicitó que se le impusiera al recurrente una multa administrativa y se le ordenara restituir la cantidad de $3,000.00.

En respuesta, el 26 de mayo de 2023, el recurrente presentó "*Contestación a Querella, Alegaciones Responsivas y Defensas Afirmativas.*" Admitió que fungía como alcalde del Municipio de Isabela al momento de ocurrir los hechos alegados en la "*Querella.*" Además, admitió que suscribió un contrato el día 1 de abril de 2021, mediante el cual el señor Torres Rosado se obligó a prestar servicios de consultoría. Asimismo, aceptó la existencia de una Ordenanza Municipal ("Ordenanza Núm. 11 Serie 1998-1999"), la cual autorizó al Municipio de Isabela a formar parte del "Consorcio del Noroeste." Sin embargo, alegó que para esa fecha no ocupaba el puesto de alcalde de Isabela y que dicha ordenanza perdió vigencia en diciembre del 2016 al culminar el cuatrienio.

---

[1] El referido contrato fue enmendado el 17 de mayo de 2021 a los fines de añadir otros servicios de consultoría que habría de realizar el señor Torres Rosado.

A su vez, sostuvo que la participación del Municipio de Isabela en el "Consorcio del Noroeste" dependía de que la Legislatura Municipal le autorizara ratificar los acuerdos anteriores. Adujo, que dicha participación también dependía de que la referida legislatura le autorizara a suscribir el "Acuerdo Intermunicipal" para constituir el "Consorcio del Noroeste." Arguyó, que el "Acuerdo Intermunicipal" sí fue suscrito por los diferentes alcaldes que formaban parte del "Consorcio del Noroeste," pero en fecha de 27 de mayo de 2021. Por lo cual, sostuvo que, a la fecha de la relación contractual y su enmienda, el Municipio de Isabela no formaba parte del "Consorcio del Noroeste."

En cuanto al Municipio de Aguadilla, arguyó que el 13 de mayo de 2019, el referido municipio aprobó la "Ordenanza Núm. 29 Serie 2018-2019" en la que autorizó al alcalde de dicho municipio a dejar de formar parte del "Consorcio del Noroeste." A la luz de lo anterior, esgrimió que para la fecha de la relación contractual objeto de litigio el Municipio de Aguadilla tampoco era parte del "Consorcio del Noroeste." Ante tales alegaciones, solicitó que se declarara *No Ha Lugar* la *"Querella."* En la alternativa, peticionó que la causa de acción fuera desestimada sumariamente.

Así las cosas, el 6 de octubre de 2023, las partes presentaron un *"Informe de Conferencia con Antelación a la Audiencia."*[2] Mediante este, esbozaron las siguientes estipulaciones:

**ESTIPULACIONES DE HECHOS NO CONTROVERTIDOS**

1. El Querellado se desempeña como Alcalde del Municipio de Isabela desde el 2 de enero de 2021 hasta el presente, luego de haber resultado electo en las elecciones generales de noviembre de 2020.

2. El Querellado era servidor público al momento de los hechos expuestos en la Querella que ocurrieron a partir del 2 de enero de 2021, según lo define el Artículo 1.2 (gg) de la Ley 1-2012, *supra*.

3. El 1 de abril de 2021, el Querellado, en representación del Municipio, otorgó el contrato número 2021-000356, para

---

[2] La Conferencia Con Antelación a la Audiencia se celebró el día 27 de octubre de 2023. En la misma, la Oficial Examinadora les comunicó a las partes que no existía controversia sobre los hechos materiales del caso. Ante ello, les concedió a las referidas partes un término a finalizar el 20 de febrero de 2023 para que presentaran una "solicitud de resolución sumaria."

servicios de consultoría (servicios de consultor), con el Sr. Wilfred Yasel Torres Rosado.

4. El 17 de mayo de 2021, el Querellado, en representación del Municipio, otorgó con el señor Torres Rosado el contrato número 2021-000356-A, enmienda a servicios de consultoría (servicios de consultor).

5. El Municipio de Isabela pagó al señor Torres Rosado la cantidad de $3,000.00, mediante el cheque número 17400 de 2 de junio de 2021.

6. El pago por la cantidad de $3,000.00 al señor Torres Rosado, mediante el cheque número 17400 de 2 de junio de 2021, fue por los servicios prestados por este del 4 al 28 de abril de 2021 por concepto del contrato número 2021-000356.

7. El 23 de junio de 1999, mediante la Ordenanza Número 11, Serie 1998-99, se autorizó al Municipio de Isabela a formar parte del Consorcio del Noroeste, el cual, bajo la Ley de Innovación y Oportunidades para la Fuerza Trabajadora (Workforce Innovation and Opportunity Act-WIOA), se conoce como Junta Local de Desarrollo Laboral del Noroeste (JLDLN).

8. Mediante la Ordenanza Número 31, Serie 2015-2016, también se autorizó al Municipio de Aguadilla a formar parte del Consorcio del Noroeste.

**ESTIPULACIONES DE DOCUMENTOS,**

1. Certificación de 15 de septiembre de 2021, emitida por la Sra., Zuleika A. Acevedo Mercado de la Secretaría Municipal de Isabela, a la cual se adjuntó copia del contrato de servicios profesionales número 2021-0000356 con sus anejos y copia del contrato de servicios profesionales número 2021-0000356- A, enmienda, con sus anejos.

2. Certificación de 27 de marzo de 2023, emitida por la Sra. Sandra Figueroa Cruz, Directora de Finanzas y Presupuesto del Municipio de Isabela, a la cual se adjuntó documentación relacionada con el pago por la cantidad de $3,000.00 al Sr. Wilfred Y. Torres Rosado.

3. Copia de Ordenanza Número 29, Serie 2018-2019, "Para autorizar al Alcalde de Aguadilla, Honorable Carlos Méndez Martínez, a dejar de formar parte del organismo intermunicipal que comprende los pueblos de Aguada, Aguadilla, Isabela, Moca, Rincón y Añasco, conocido como Área Local de Desarrollo Laboral Noroeste, antes, Consorcio del Noroeste, según lo dispone la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, según enmendada, en su Artículo 2.001, incisos P, Q y R", aprobada por la Legislatura Municipal de Aguadilla y el Honorable Alcalde de Aguadilla, el 13 y 14 de junio de 2019, respectivamente.

4. Copia de Ordenanza Número 27, Serie 2020-2021, "Para derogar la Ordenanza Número 29, Serie 2018-2019, intitulada: "Para autorizar al Alcalde de Aguadilla, Honorable Carlos Méndez Martínez, a dejar de formar parte del organismo intermunicipal que comprende los pueblos de Aguada, Aguadilla, Isabela, Moca Rincón y Añasco, conocido como área Local de desarrollo Laboral Noroeste, antes, Consorcio del Noroeste, según lo dispone la Ley de nuncios [sic] Autónomos del estado Libre Asociado de Puerto Rico, según enmendada, en su Artículo 2.001, incisos P, Q y R", aprobada por la Legislatura Municipal de Aguadilla y el

Honorable Alcalde de Aguadilla, el 17 Y] 18 de marzo de 2021, respectivamente.

5.  Copia de Ordenanza Número 48, Serie 2020-2021, "Para ratificar el acuerdo de participación del Municipio de Aguadilla dentro del Consorcio del Noroeste, el cual bajo la Ley de oportunidades y de innovación (WIOA) se conoce como Junta. Local de Desarrollo Laboral del Noroeste (JLDLN), compuesto por los Municipios de Aguada, Aguadilla, Añasco, Isabela, Moca, Rincón y San Sebastián, previamente aprobada", aprobada por la Legislatura Municipal de Aguadilla y el Honorable Alcalde de Aguadilla, el 26 y 27 de mayo de 2021, respectivamente.

6.  Certificación de 25 de octubre de 2022, emitida por la Sra. Zuleika A, Acevedo Mercado de la Secretaría Municipal de Isabela, mediante la cual adjuntó los siguientes documentos:

    a.  Copia de la Ordenanza Número 11, Serie 1998-1999, "Para autorizar al alcalde de Isabela a formar parte del organismo intermunicipal conocido como. el Consorcio del Noroeste que se compone de los pueblos de Aguadilla, Moca, Aguada, Rincón, Añasco y San Sebastián según dispone la Ley de Municipios Autónomos, Ley #81, Artículo 2.001, Incisos (p), (q) (r) y para otros fines",

    b.  Copia de Ordenanza Número 38, Serie 2020-2021, "Para ratificar el acuerdo de participación del municipio de Isabela dentro del Consorcio del Noroeste, el cual bajo la Ley de oportunidades y de innovación (WIOA) se conoce como Junta Local de Desarrollo Laboral del Noroeste (ILDLN), compuesto por los Municipios de Aguada, Aguadilla, Añasco, Isabela, Moca, Rincón y San Sebastián, previamente aprobada",

    c.  Copia de Acuerdo intermunicipal para constituir el Consorcio del Noroeste (ALDLN).

7.  Copia de Ordenanza Número 10, Serie 2015-2016, "Para ratificar el acuerdo de participación del municipio de Isabela dentro del Consorcio del Noroeste, el Área Local de Desarrollo Laboral del Noroeste compuesto por los Municipios de Isabela, Aguadilla, Moca, Añasco, Rincón y Aguada, previamente aprobado y para otros fines",

8.  Acuerdo Intermunicipal del Consorcio del Noroeste

Posteriormente, el 20 de febrero de 2024, la OEG presentó *"Moción Solicitando Adjudicación Sumaria."* [3] Adujo, que no existen hechos

---

[3] La OEG acompañó su petición con la siguiente prueba documental: "Certificación 2022-IP-0054" sobre expedición de copias certificadas de ordenanzas del Municipio de Isabela de fecha de 25 de octubre de 2022; "Ordenanza Número 11, Serie 1998-99;" "Certificación" del 25 de junio de 1999 del Municipio de Isabela; "Ordenanza Número 38" – "Serie 2020-2021" del Municipio de Isabela del 19 de mayo de 2021; Certificación del 19 de mayo de 2021 del Municipio de Isabela; "Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN) del 27 de mayo de 2021; "Ordenanza Número 10" – "Serie 2015-2016" del 20 de enero de 2016 Municipio de Isabela; "Certificación" del 20 de enero de 2016 del Municipio de Isabela; "Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN)" del 5 de abril de 2018; "Certificación 2022-IP-0054" sobre participación en el "Consorcio del Noroeste" del Municipio de Isabela del 25 de octubre del 2022; "Certificación 2022-IP-0054" sobre tiempo de membresía del Municipio de Isabela en el "Consorcio del Noroeste," expedida el 25 de octubre de 2022; "Ordenanza Núm. 29" – "Serie 2018-2019" del 14 de junio de 2019 del Municipio de Aguadilla; "Certificación" del 19 de agosto de 2021 del Municipio de Aguadilla; "Ordenanza Núm. 27" – "Serie 2020-2021" del del Municipio de Aguadilla del 18 de marzo de 2021; "Certificación" del 19 de agosto de 2021 del Municipio de Aguadilla; Epístola sobre "Asunto: Selección del Presidente de la Junta de Alcaldes del Noroeste" de fecha de 4 de

materiales en controversia, por lo cual procedía una adjudicación sumaria del asunto litigioso. Reiteró, que para la fecha de los hechos relatados en la "*Querella*" el recurrente era funcionario público y que ocupaba el puesto de alcalde del Municipio Isabela. Además, sostuvo que existe prueba documental que demuestra que a la fecha de la relación contractual en cuestión el Municipio de Isabela formaba parte del "Consorcio del Noroeste." Sobre el particular, hizo alusión a la "Certificación" del 25 de octubre de 2022, emitida por la Secretaria Municipal de Isabela. Aseveró, que en esta se expone que, en el periodo del 1 de abril de 2021 al 30 de junio de 2021, el Municipio de Isabela fue parte del "Consorcio del Noroeste."

---

marzo de 2021; Misiva del 20 de mayo de 2021 intitulada "Certificación;" "Ordenanza Núm. 48" – "Serie 2020-2021" del 27 de mayo de 2021 del Municipio de Aguadilla; "Certificación" del 19 de agosto de 2021 del Municipio de Aguadilla; "Certificación" – "REF. 2022-IP-0054/2022-IP-055" del 15 de noviembre de 2022, expedida por la Directora Ejecutiva del Área Local de Desarrollo Laboral (Consorcio del Noroeste), que comprende el periodo del 23 de septiembre de 1993 al presente; "Certificación" – "REF. 2022-IP-0054/2022-IP-055" del 15 de noviembre de 2022, expedida por la Directora Ejecutiva del Área Local de Desarrollo Laboral (Consorcio del Noroeste), que comprende el periodo del 1 de abril al 30 de junio de 2021; "Certificación" del 15 de septiembre de 2021 del Municipio de Isabela; "Formulario de Solicitud para Preparar Orden de Compra" del 10 de mayo de 2021 del Municipio de Isabela; "Certificación" del 1 de abril de 2021 del Municipio de Isabela; Documento intitulado "Recibo de Envío" de fecha de 1 de abril de 2021; Contrato de Servicios de Consultoría, Núm. 2021-000356 del 1 de abril de 2021; "Solicitud de Contrato" "Propuesta de Servicios Profesionales" del 18 de marzo de 2021; "Certificación de Estatus de Elegibilidad para Empleo en el Servicio Público o Contrato de Servicios Profesionales y Estatus de Elegibilidad Conforme con la Disposiciones de la Ley Núm. 70 de julio de 2010 del 25 de febrero de 2021;" "Solicitud para la Obtención de Información del Registro de Personas Convictas por Corrupción y Delitos Relacionados (Ley Núm. 2-2018);" "Certificación de Deuda;" "Certificación de Radicación de Planillas;" "Certificación Negativa," expedida por el Centro de Recaudaciones de Ingresos Municipales (CRIM); "Declaración Jurada" suscrita por Wilfred Y. Torres Rosado; "Certificación sobre Litigio;" "Certificación Negativa de Caso de Pensión Alimentaria;" "Certificado Negativo de Antecedentes Penales;" "Recibo de Recaudador" del 27 de abril de 2021; Comunicación electrónica remitida por Wilfred Torres en marzo de 2021; ; Comunicación electrónica remitida por Wilfred Torres en febrero de 2021; "Hoja de Trámite" del 23 de febrero de 2021; "Hoja de Cotejo Documentos Requeridos para Otorgar Contratos Servicios Profesionales Menor de $16,000.00 (Según Aplique);" Comunicación electrónica, emitida por la Oficina de Secretaría Municipal del Municipio de Isabela en fecha de 23 de febrero de 2021; "Certificación sobre Otorgamiento de Contrato, Escritura o Documento Relacionado" de fecha de 17 de mayo de 2021; "Recibo de Envío" de fecha de 23 de junio de 2021; "Certificación" de 23 de junio de 2021 del Municipio de Isabela; "Enmienda a Servicio de Consultoría (Servicios de Consultor) de fecha de 17 de mayo de 2021" "Solicitud de Contrato" de 27 de mayo de 2021; "Propuesta de Servicios Profesionales" de 28 de abril de 2021; Resumé de Wilfred Y. Torres Rosado; "Certificación" del 14 de septiembre de 2021 del Municipio de Aguadilla; "Certificación" de pago del 27 de marzo de 2023; "Certificación" de documentación del 27 de marzo de 2023; "Comprobante de Desembolso" del 2 de junio de 2021; "Orden de Compra o Servicio" del 17 de mayo de 2021; "Certificación" de factura del 4 de mayo de 2021; "Informe de Servicios Profesionales" – Abril 2021; Carta dirigida a la OEG en fecha de 16 de junio de 2021; "Hoja de Trámite" de fecha de 31 de agosto de 2021; "Referido CE-22-099 (Sr. Wilfred Y. Torres Rosado)" del 31 de agosto de 2021; Comunicación escrita de la OEG del 23 de agosto de 2021; Comunicación escrita sobre Ordenanza Núm. 13 del Municipio de Isabela de fecha de 25 de agosto de 2021; Comunicación escrita sobre "Ordenanzas sobre Participación del Municipio de Aguadilla dentro de la Junta Local de Desarrollo Laboral del Noroeste" de fecha de 20 de agosto de 2021; Comunicación escrita de Wilfred Torres de fecha de 18 de agosto de 2021; Comunicación escrita del la OEG de fecha de 22 de julio de 2021; Comunicación escrita de la OEG de fecha de 21 de junio de 2021; Comunicación escrita de la OEG de fecha de 4 de febrero de 2021; Comunicación escrita de la Directora Ejecutiva del Área Local del Desarrollo Laboral de fecha de 25 de enero de 2023.

Asimismo, indicó que el Municipio de Aguadilla también formaba parte del referido consorcio al momento de perfeccionarse la relación contractual en litigio. Sobre esto, alegó que el 18 de marzo de 2021, se aprobó la "Ordenanza Núm. 27, Serie 2020-2021, para derogar la Ordenanza Núm. 29, Serie 2018-2019." En vista de ello, sostuvo que el Municipio de Aguadilla permaneció como miembro del "Consorcio del Noroeste." A la luz de lo expuesto, reiteró que el recurrente utilizó las facultades de su puesto para conceder un beneficio contractual al señor Torres Rosado que estaba vedado por el Código Municipal. Ante tales alegaciones, peticionó que se dispusiera sumariamente del caso y en consecuencia se le impusiese una multa administrativa al recurrente.

Por su parte, el 25 de marzo de 2024, el recurrente presentó "*Oposición a Solicitud de Resolución Sumaria y Petición de Desestimación Sumaria.*"[4] La postura del recurrente se sintetiza en el supuesto de que existen hechos materiales incontrovertidos que impiden una adjudicación favorable para la OEG, pero que sí permiten la desestimación sumaria de la *"Querella."* Por otro lado, también planteó que era necesario la celebración de una conferencia con antelación a la audiencia antes de adjudicarse el caso. En cuanto a sus argumentos principales reiteró que, al momento de suscribirse el contrato en cuestión el Municipio de Isabela y el Municipio de Aguadilla no formaban parte del "Consorcio del Noroeste." Entiende, que, a la fecha de perfeccionamiento del referido contrato, la legislatura municipal de Isabela no había autorizado al recurrente a ratificar los acuerdos anteriores ni a suscribir el "Acuerdo Intermunicipal." De igual modo, sostuvo que las ordenanzas Núm. 29 – Serie 2018-2019 y Núm. 27 – Serie 2020-2021, sustentan el hecho de que el Municipio de Aguadilla tampoco formaba parte del aludido consorcio a la fecha de 1 de abril de 2021 ni a la fecha en que fue enmendado el referido contrato.

---

[4] El recurrente acompañó su escrito con la siguiente prueba documental: "Informe de Conferencia con Antelación a la Audiencia;" "Orden" de fecha de 1 de noviembre de 2023; "Ordenanza Núm. 29 – Serie 2018-2019" del 14 de junio de 2019; "Certificación" del 19 de agosto de 2021sobre la Ordenanza Núm. 29 – Serie 2018-2019;" "Ordenanza Núm. 27 – Serie 2020-2021" del 18 de marzo de 2021; "Certificación" del 19 de agosto de 2021 sobre la Ordenanza Núm. 27 – Serie 2020-2021;" "Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN)" del 27 de mayo de 2021.

Posteriormente, el 24 de febrero de 2025, el Oficial Examinador presentó su *"Informe de Oficial Examinador."* Mediante este, recomendó a la OEG que sancionara al recurrente por violentar el Artículo 4.2(b), *supra.* A su vez, esbozó las siguientes determinaciones de hechos:

**DETERMINACIONES DE HECHOS:**

**a. Municipio de Isabela.**

1. El 23 de junio de 1999, mediante la Ordenanza Núm. 11, Serie 1998-1999, se autorizó al Municipio de Isabela a formar parte del Consorcio. La misma fue firmada por el Hon. Carmelo Pérez Rivera, entonces alcalde de dicho ayuntamiento.

2. La Junta de Alcaldes es el cuerpo que rige el Consorcio. Está compuesto por los alcaldes de los municipios que comprenden el JLDLN." .

3. El 20 de enero de 2016, se aprobó la Ordenanza Núm. 10, Serie 2015-2016, para ratificar el acuerdo de participación del Municipio de Isabela dentro del Consorcio. La misma fue firmada por el Hon. Carlos Delgado Altieri, entonces alcalde del mencionado ayuntamiento.

4. El 5 de abril de 2018, el alcalde Delgado Altieri, junto con los alcaldes de los municipios de Aguada, Aguadilla, Añasco, Moca y Rincón, suscribieron el Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN).

5. El señor Méndez Pérez se desempeña como alcalde del Municipio de Isabela desde el 2 de enero de 2021.

6. El señor Torres Rosado fue legislador municipal del Municipio de Aguadilla del 11 de enero al 6 de julio de 2021, fecha en que hizo efectiva su renuncia a dicho puesto."

7. El 3 de marzo de 2021, se celebró una reunión extraordinaria de la Junta de Alcaldes del Área Local del Noroeste. Por unanimidad, se escogió al Hon. Julio Roldán Concepción, alcalde del Municipio de Aguadilla, como presidente de la Junta de Alcaldes; al Hon. Carlos López Bonilla, alcalde del Municipio de Rincón, como su vicepresidente; y al querellado como secretario de dicha junta."

8. El 1 de abril de 2021, el querellado otorgó el contrato número 2021-000356, para servicios de consultoría, con el señor Torres Rosado. Dicho contrato estuvo en vigor del 1 de abril al 30 de junio de 2021.

9. El Municipio de Isabela se mantuvo como miembro del Consorcio del 1 de abril al 30 de junio de 2021.

10. El Municipio de Isabela desembolsó $3,000.00 a favor del señor Torres Rosado por los servicios prestados del 4 al 8 de abril de 2021, mediante cheque núm. 17400 del 2 de junio de 2021, por concepto del contrato 2021-000356.

11. El 17 de mayo de 2021, el querellado suscribió el contrato núm. 2021-000356-A con el señor Torres Rosado, (a los fines de enmendar el contrato 2021-000356 para añadir otros servicios de consultoría para el Municipio de Isabela.

12. El 19 de mayo de 2021, se aprobó la Ordenanza Núm. 38, Serie 2020-2021, para ratificar el acuerdo de participación del Municipio de Isabela dentro del Consorcio. Ésta fue firmada por el Sr. Miguel Méndez Pérez en esa misma fecha.

13. El 27 de mayo de 2021, el querellado, como alcalde del Municipio de Isabela, junto con los alcaldes de los municipios de Aguada, Aguadilla, Añasco, Moca, Rincón y San Sebastián, suscribieron el Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDEN).

**b.     Municipio de Aguadilla**

14. Mediante la Ordenanza Núm. 31, Serie 2015-2016, se autorizó al Municipio de Aguadilla a formar parte del Consorcio.

15. El 5 de abril de 2018, el Hon. Carlos Méndez Martínez, entonces alcalde del Municipio de Aguadilla, así como los respectivos alcaldes de los municipios de Aguada, Añasco, Isabela, Moca y Rincón suscribieron el Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN).

16. El 14 de junio de 2019, el Municipio de Aguadilla aprobó la Ordenanza Núm. 29, Serie 2018-2019 (Ordenanza Núm. 29), a los fines de autorizar al alcalde Méndez Martínez a dejar de formar parte del Consorcio.

17. El 18 de marzo de 2021, el Municipio de Aguadilla aprobó la Ordenanza Núm. 27, Serie 2020-2021 (Ordenanza Núm. 27), a los fines de derogar la Ordenanza Núm. 29, que autorizaba al alcalde del Municipio a dejar de formar parte del Consorcio.

18. Dicha Ordenanza Núm. 27 establece que, el 3 de marzo de 2021, la Junta Estatal de Desarrollo Laboral (sic) no había tomado acción para desligar al Municipio del Consorcio. Además, declaró la intención del Municipio de permanecer en el Área Local de Desarrollo Laboral del Noroeste y, para ello, autorizó al alcalde Julio Roldán Concepción, a nombre del Municipio, a que se mantenga formando parte del organismo municipal.

19. El 26 de mayo de 2021, el Municipio de Aguadilla aprobó la Ordenanza Núm. 48, Serie 2020-2021, para ratificar el acuerdo de participación del Municipio dentro del Consorcio.

**c.     Consulta y Referido de OEG**

20. El 16 de junio de 2021, el señor Torres Rosado envió una misiva a la OEG para consultar sobre el alcance del artículo 1.023 de la Ley 107 y su contratación para servicios de consultoría con el Municipio de Isabela.

21. El 31 de agosto de 2021, el entonces subdirector ejecutivo de la OEG, Lcdo. Aniano Rivera Torres, notificó al señor Torres Rosado que la contratación en cuestión activó la prohibición dispuesta en el artículo 1.023 de la Ley 107 y, en consecuencia, era necesaria que la OEG autorizara dicha contratación previo a que se suscribiera la misma. También se le informó que la consulta se referiría al Área de Investigaciones y Procedimiento Administrativo (AIPA) para el trámite correspondiente.

Así las cosas, el 1 de abril de 2025, el Director Ejecutivo de la OEG notificó la *"Resolución"* que hoy nos ocupa. Mediante esta, adoptó en su

totalidad el *"Informe de Oficial Examinador."* Así pues, determinó que el recurrente violentó la disposición ética recogida en el Artículo 4.2(b), *supra.* En consecuencia, le impuso una sanción de $3,000.00.

En desacuerdo, oportunamente el 15 de abril de 2025, el recurrente presentó "*Moción de Reconsideración y Solicitud de Desestimación,"* la cual fue declarada *No Ha Lugar* el 30 de abril de 2025.

Aun en desacuerdo, el 28 de mayo de 2025, el recurrente presentó ante nuestra consideración un recurso de revisión judicial. Mediante este, expuso los siguientes señalamientos de error:

> Primer Error: Erró la OEG al acoger el Informe del Oficial Examinador a pesar de que en este no se consideró las presunciones y defensas afirmativas levantadas en la contestación a la querella.
>
> Segundo Error: Erró la OEG al emitir una Resolución Sumaria la cual es improcedente en derecho y viola las garantías mínimas del debido proceso de ley.
>
> Tercer Error: Erró la OEG al concluir que en este procedimiento atendido sumariamente quedó demostrado con evidencia clara, robusta y convincente que el querellado infringió el inciso (B) del Artículo 4.2, *supra.*
>
> Cuarto Error: Erró la OEG al no desestimar sumariamente la Querella Núm. 23-42 a pesar de que de las estipulaciones y la prueba incontrovertida surge que para las fechas en que se otorgaron los contratos 2021-000356 y 2021-000356-A los municipios de Aguadilla e Isabela no formaban parte del Consorcio del Noroeste.

El 16 de junio de 2025, este Tribunal le concedió un término de treinta (30) días a la OEG para que presentara su alegato en oposición.

En cumplimiento de ello, el 3 de julio de 2025, la OEG presentó su *"Alegato en Oposición."* Acompañó su escrito con una *"Solicitud de Permiso para Presentar Escrito en Exceso de Páginas,"* para lo cual concedemos la autorización peticionada.

Con el beneficio de la comparecencia de ambas partes, procedemos a esbozar el marco doctrinal aplicable al presente caso.

**II.**

**A. Revisión Judicial de las Decisiones Administrativas**:

La revisión judicial de determinaciones administrativas está limitada por los parámetros establecidos en la Ley de Procedimiento Administrativo

Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 LPRA. sec. 9671-977. De ordinario, esta tiene lugar luego de que se adjudican las controversias pendientes ante una agencia y concluyen todos los trámites administrativos*. Miranda Corrada v. DDEC et al.*, 211 DPR 738, 746 (2023).

Las determinaciones de las agencias administrativas son revisables ante el foro judicial para garantizar que estas actúan dentro de marco de las facultades que les fueron delegadas por ley. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* 213 DPR 743, 753 (2024); *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022). De esta manera, los ciudadanos tienen un foro al cual recurrir para vindicar sus derechos y obtener un remedio en los casos en que las agencias actúen de forma arbitraria. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 753. La revisión judicial de una decisión administrativa se circunscribe a examinar lo siguiente: 1) si el remedio concedido por la agencia fue el apropiado; 2) si las determinaciones de hecho realizadas por la agencia estuvieron sustentadas por la prueba sustancial que surgió del expediente administrativo; y 3) si, mediante una revisión completa y absoluta, las conclusiones de derecho fueron correctas. *Otero Rivera v. Bella Retail Group, Inc.* y otros, 2024 TSPR 70.

Cabe resaltar, que en el ejercicio de revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia administrativa. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 754. Antes de variar la referida decisión se debe examinar la totalidad del expediente y "determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba." *Íd.* A su vez, las decisiones administrativas se deben evaluar bajo el marco de la deferencia, por razón de la experiencia y pericia de dichas agencias respecto a las facultades que se le han delegado. *Batista, Nobbe v. JTA. Directores*, 185 DPR 206, 215 (2012),

En consideración a la aludida deferencia, se ha establecido que "las decisiones de las agencias administrativas tienen una presunción de legalidad y corrección que los tribunales deben respetar mientras que la parte que las impugna no produce suficiente evidencia para derrotarlas." *Batista, Nobbe v. JTA. Directores*, supra, pág. 215. A la luz de ello, la parte que impugne una decisión administrativa tiene el peso de la prueba para demostrar que esta no se sustenta en el expediente administrativo o que las conclusiones a las cuales llegó la agencia son irrazonables. *OEG v. Martínez Giraud*, supra, pág. 89.

**B**. **Procedimiento Adjudicativo y Disposición sumaria de los asuntos que se dilucidan ante las agencias administrativas**:

El proceso adjudicativo es aquel por el cual "se adjudican derechos u obligaciones de una o más personas específicas." *Mun. de San Juan v. Jta. Planificación,* 189 DPR 895, 906 (2013). En el caso de las agencias administrativas los procedimientos adjudicativos se caracterizan por ser de naturaleza cuasi judicial. *J. P. v. Frente Unido I*, 165 DPR 445, 461 (2005). Estos tipos de procesos son regulados por un cuerpo de reglas mínimas establecidas en la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9641-9662; *SLG Saldaña-Saldaña v. Junta,* 201 DPR 615, 621 (2018).

La referida legislación permite a las agencias, al amparo de ciertos criterios, resolver una controversia sumariamente. *O.C.S v. Universal*, 187 DPR 164, 177-178 (2012). A tenor de ello, la sección 3.7(a) de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9647 establece lo siguiente:

> (a) Si la agencia determina que es necesario celebrar una vista adjudicativa, podrá citar a todas las partes o sus representantes autorizados e interventores, ya sea por su propia iniciativa o a petición de una de las partes, a una conferencia con antelación a la vista, con el propósito de lograr un acuerdo definitivo o simplificar las cuestiones o la prueba a considerarse en la vista. Se podrán aceptar estipulaciones, siempre que la agencia determine que ello sirve a los mejores intereses públicos.

> (b) Si la agencia determina a solicitud de alguna de las partes y luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aquéllos que obren en el expediente de la agencia, que no es necesario celebrar una vista

adjudicativa, podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final, o parcial resolviendo cualquier controversia entre las partes, que sean separable de las controversias, excepto en aquellos casos donde la ley orgánica de la agencia disponga lo contrario.

La agencia no podrá dictar órdenes o resoluciones sumarias en los casos en que (1) existen hechos materiales o esenciales controvertidos; (2) hay alegaciones afirmativas en la querella que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la petición una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derechos no procede.

La adjudicación sumaria persigue agilizar los procedimientos ante las agencias cuando no existen hechos esenciales controvertidos. *O.C.S v. Universal*, supra. Ello, dado que, "[n]ada impide que una agencia pueda adjudicar sin celebrar una vista evidenciaría cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente señale claramente la corrección de la determinación de la agencia." *Íd.* "De este modo, se evita el tener que celebrar una audiencia evidenciaría que no aportaría ningún elemento meritorio al proceso analítico." *Íd,* citando a J. Echevarría Vargas, *Derecho administrativo puertorriqueño,* San Juan, Ed. Situm, 2012, pág. 231.

**C**.      **Ley de Ética Gubernamental**:

La Ley de Ética Gubernamental tiene el objetivo principal de dotar a la OEG de facultades preventivas y fiscalizadoras. Exposición de Motivos la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, según enmendada, 3 LPRA sec. 1854 et seq. De igual modo, su propósito se centra en la promoción de los valores de la confiabilidad, bondad, justicia, civismo, respeto y responsabilidad para lograr que los servidores públicos se desempeñen con honestidad, rigurosidad y eficiencia. *Id.* A la luz de dichos valores, la OEG penaliza a todos aquellos funcionarios públicos que trasgreden la normativa ética. *Id.* Con ello, la OEG busca evitar que se coloque en riesgo la estabilidad del soporte moral del Estado y que se vulnere la pureza de las responsabilidades atinentes al puesto del funcionario público. *Id.*

La OEG tiene la facultad de "[p]romover y formular las políticas y los programas de conducta ética y moral para los servidores públicos." 3 LPRA

sec. 1855b; *Buxó Santiago v. Oficina de Ética Gubernamental*, 2024 TSPR 130. Dicha facultad se dirige a la consecución de varios objetivos, entre los cuales se destaca el eliminar del servicio público toda práctica que resulte en ilegalidad, discriminación, fraude o de impericia administrativa. *Id.* En cuanto a la aplicabilidad de la referida legislación, ésta regula la conducta de los servidores y exservidores públicos de la Rama Ejecutiva. 3 LPRA sec. 1857. Para efectos de la precitada ley el concepto de servidor público se define de la siguiente forma:

> [P]ersona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración. También, incluye al contratista independiente cuyo contrato equivale a un puesto o cargo, o que entre sus responsabilidades está la de intervenir directamente en la formulación e implantación de la política pública. 3 LPRA sec. 1854.

Para regular la conducta de dicho servidor público, la Ley de Ética Gubernamental establece en su artículo 4.2 una serie de prohibiciones éticas. En lo aquí concerniente, el Artículo 4.2(b) lee como sigue:

> Un servidor público no puede utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o para una persona privada o negocio, cualquier beneficio que no esté permitido por ley. 3 LPRA sec. 1857a.

Según se puede apreciar, para que se perfeccione una violación ética al amparo del precitado artículo, la persona en cuestión debe a) ser un servidor público; b) que utilice los deberes y facultades de su cargo o la propiedad o fondos públicos; c) con el fin de obtener para sí o un tercero algún beneficio vedado por ley.

Con relación al estándar probatorio requerido para fundamentar una infracción ética, el Tribunal Supremo, ha expresado que dicho estándar debe ser uno de prueba clara, robusta y convincente. *OEG v. Martínez Giraud*, supra, pág. 83-84. A pesar de que el aludido estándar probatorio no es susceptible de definición precisa, sí se describe que éste debe reunir "aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables." *In re Rodríguez Mercado*, 165 DPR 630, 641 (2005). Además, se establece que dicho estándar es uno de naturaleza más sólida que el estándar de

preponderancia de la prueba, pero menos riguroso que la prueba más allá de toda duda razonable. *Id.* El criterio rector para este tipo de casos es de una prueba clara, robusta y convincente no afectada por reglas de exclusión y que descarte las conjeturas. *Id*, pág. 640.

**D.     Código Municipal**:

El Código Municipal de Puerto Rico (Código Municipal), según estatuido en la Ley Núm. 107-2020, según enmendada, 21 LPRA sec. 7001 et seq., consiste en "una compilación sistemática, ordenada y actualizada de toda legislación municipal aprobada por la Asamblea Legislativa de Puerto Rico referente a la organización, gobierno, administración y funcionamiento de los municipios." 21 LPRA sec. 7002. Véase, además, *Martínez Maldonado v. Consejo de Seguridad y Recreación de Urbanización Villamar Este, Inc.*, (CONSERVE), 2024 TSPR 125.

La referida legislación establece como política pública, entre otras cosas, el fin aspiracional de que los municipios cuenten con los recursos necesarios para rendir sus servicios. 21 LPRA sec. 7003. Siendo así, los poderes gubernamentales deberán proteger las fuentes de recursos municipales y las facultades tributarias de los municipios se interpretarán de forma liberal a favor del pueblo representado por el municipio. *Id.* Como norma general, los poderes y facultades conferidos a los municipios se interpretarán de forma liberal a favor de los municipios y de manera armoniosa con la buena práctica de política fiscal y administrativa. 21 LPRA sec. 7005.

En lo aquí pertinente, la Legislatura Municipal electa y constituida conforme a derecho podrá legislar sobre los asuntos de naturaleza municipal. 21 LPRA sec. 7011. Las legislaciones adoptadas por el referido cuerpo electo se conocerán como ordenanzas municipales. Dichas ordenanzas se definen como aquellas legislaciones "de la jurisdicción municipal debidamente aprobada, cuyo asunto es de carácter general o específico y tiene vigencia indefinida." 21 LPRA sec. 8351. En nuestro ordenamiento jurídico las ordenanzas municipales son consideradas

fuentes de derecho. Véase, *Con. Tit. Centro Int'l Torres II v. PRCI,* 210 DPR 403, 413 (2022). Además, establece el Artículo 1.007 del Código Municipal que "[l]as ordenanzas, resoluciones y reglamentos municipales no podrán suspenderse ni dejarse sin efecto, excepto, por orden del tribunal competente, por legislación estatal que no menoscabe derechos adquiridos o mediante ordenanza o resolución al efecto." 21 LPRA sec. 7012. Las ordenanzas municipales tendrán efectividad en la fecha en que sean firmadas por el Alcalde y regirán como regla general desde la fecha que se indique en su cláusula de vigencia. 21 LPRA sec. 7067.

De otra parte, el Código Municipal delega a los municipios la faculta de crear consorcios y suscribir convenios o contratos. En lo pertinente, el Artículo 1.008 establece lo siguiente con relación al poder municipal de crear consorcios:

> Crear alianzas intermunicipales o Consorcios que permitan a dos (2) o más municipios identificar problemas comunes, planificar y desarrollar actividades o servicios conjuntamente, a beneficio de los habitantes. Disponiéndose que los bienes necesarios para la atención de los bienes comunes antes descritos podrán ser puestos bajo la administración de un fideicomiso, conforme a lo dispuesto en este Código y la Ley de Fideicomisos. La organización de los Consorcios se realizará mediante convenio suscrito por los Alcaldes, con la aprobación de la mayoría absoluta de los miembros de cada una de las Legislaturas Municipales concernidas, entiéndase una mayoría con más de la mitad de los votos de los miembros activos que componen el organismo en cuestión. Una vez aprobado el convenio, con la intención de constituir un Consorcio, éste tendrá existencia y personalidad jurídica propia, separada del municipio, a tenor con lo dispuesto para las sociedades en el Código Civil de Puerto Rico […] 21 LPRA sec. 7013.

Así pues, nuestro Código Civil establece que "[e]l funcionamiento de la sociedad se verifica según lo convienen los socios entre las formas conocidas o que pueden establecerse mediante la autonomía de la voluntad." 31 LPRA sec. 10504. Asimismo, dispone que "[l]os derechos y las obligaciones de los socios son aquellos que han convenido en el contrato. Sus facultades y su responsabilidad interna también se determinan en el contrato." *Id.* En cuanto a la duración de la sociedad, el Artículo 1452 del precitado cuerpo normativo preceptúa lo siguiente:

> La sociedad existe desde que se perfecciona contractualmente y dura el tiempo convenido. A falta de convenio sobre la duración, existe:

(a)     por el tiempo que dura el negocio que dio lugar a su existencia, si este, por su naturaleza, tiene una duración limitada;
(b)     por el tiempo que dura la convivencia;
(c)     hasta que sobreviene alguna de las causas que dan lugar a la resolución contractual; o
(d)     por toda la vida de los socios.
31 LPRA sec. 10505.

En lo referente a la contratación municipal, nuestro ordenamiento jurídico considera que ésta se encuentra "revestida del más alto interés público, pues persigue fomentar la inversión adecuada, responsable y eficiente de los recursos del Estado." Véase, *Municipio de Aguada v. W. Construction, LLC* y otro, 2024 TSPR 69. En lo atinente al contrato de servicios, el Artículo 2.014 del Código Municipal establece lo siguiente con relación a dicho tipo de contratación:

> El municipio podrá contratar los servicios profesionales, técnicos y consultivos que sean necesarios para llevar a cabo las actividades, programas y operaciones municipales o para cumplir con cualquier fin público autorizado por este Código o por cualquier otro estatuto aplicable. No obstante, todo contrato que se ejecute o suscriba en contravención a lo dispuesto en este Artículo será nulo y no tendrá efecto, y los fondos públicos invertidos en su administración o ejecución serán recobrados a nombre del municipio mediante acción incoada a tal propósito.
> 21 LPRA sec. 7174.

A su vez, la contratación municipal debe cumplir con una serie de requisitos para su adecuado perfeccionamiento. Estos son los siguientes:

> (a)     que conste por escrito y esté suscrito por todas las partes;
> (b)     que su vigencia sea prospectiva y que no incluya cláusulas de renovación automática ni tácita reconducción;
> (c)     que contenga una cláusula en la cual se identifica la partida presupuestaria que sufragará el contrato;
> (d)     que cumpla con las disposiciones de la Ley 237-2004, según enmendada, cuando se trate de contrato de servicios profesionales;
> (e)     cualquier otro requisito contemplado por ley. Además, todo contrato será registrado en la Oficina del Contralor de Puerto Rico, en cumplimiento con la Ley Núm. 18 de 30 de octubre de 1975, según enmendada.
>
> 21 LPRA sec. 7174.

Además, de requisitos y formalidades, la contratación municipal también se rige por una serie de prohibiciones generales. Entre estas se encuentra la siguiente restricción ética dirigida a la contratación con legisladores municipales. Esta lee como sigue:

> No podrán mantener relaciones de negocio o contractuales de clase alguna con el municipio de cuya Legislatura Municipal sean miembros, ni con ningún otro municipio con el que el municipio mantenga un consorcio o haya organizado una corporación

municipal o entidad intermunicipal. Como excepción a lo dispuesto en este inciso, la Oficina de Ética Gubernamental podrá autorizar la contratación, de conformidad con lo dispuesto en la Ley 1- 2012, según enmendada, conocida como "Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico", y los reglamentos adoptados en virtud de la misma. No se entenderá que un Legislador Municipal incurre en la conducta prohibida en este inciso cuando se trate de permisos, concesiones, licencias, patentes o cualquier otro de igual o similar naturaleza exigido por ley, ordenanza municipal o reglamento, que constituye un requisito para que el Legislador Municipal pueda ejercer una profesión, siempre y cuando cumpla con todos los requisitos de ley y reglamento y no solicite trato preferente.
21 LPRA sec. 7044.

**III.**

En su recurso de revisión judicial, el recurrente expone cuatro señalamientos de error alegadamente cometidos por la OEG. Sobre esto, sostiene, que para la adjudicación del presente caso la OEG no tomó en consideración las presunciones y defensas afirmativas disponibles en nuestro ordenamiento evidenciario y nuestro ordenamiento procesal civil para la correcta disposición de los asuntos. De otra parte, argumenta que la OEG incidió al resolver de forma sumaria el caso, puesto que dicha agencia no probó su causa de acción de manera clara, robusta y convincente. Cónsono con lo anterior, arguye que la OEG fundamentó la *"Moción Solicitando Adjudicación Sumaria"* en evidencia inadmisible, lo que también convierte en improcedente la disposición sumaria del caso.

Además, reitera que la sanción impuesta carece de validez dado que al momento de los hechos los municipios de Isabela y Aguadilla no pertenecían al "Consorcio del Noroeste." Aduce que, para haberse perfeccionado la membresía del Municipio de Isabela en dicho consorcio, la legislatura municipal del referido municipio, debía autorizar al Alcalde a ratificar los acuerdos anteriores y a suscribir el "Acuerdo Intermunicipal." Sostiene que ello sí ocurrió, pero en fecha posterior a los hechos alegados en la *"Querella."* En cuanto al Municipio de Aguadilla, reiteró que éste no pertenecía al aludido consorcio en virtud de las ordenanzas Núm. 29, Serie 2018-2019 y Núm. 27, Serie 2020-2021. Ante tales alegaciones, peticionó que se revocara la *"Resolución"* recurrida.

Por su parte, y contrario a lo aducido por el recurrente, la OEG asevera que la naturaleza de los procesos administrativos impide que las Reglas de Evidencia y las Reglas de Procedimiento Civil se apliquen de forma automática a estos procesos. Por otro lado, la referida parte plantea que no existe controversia sobre los hechos esenciales del presente caso. Sobre el particular, resaltó que conforme lo requiere el Artículo 4.2(b), *supra,* el recurrente era un servidor público al momento de otorgar los contratos en disputa; el Municipio de Isabela desembolsó $3,000.00 a favor del señor Torres Rosado; el referido señor era legislador municipal de Aguadilla al momento de suscribir los aludidos contratos; y los municipios de Aguadilla e Isabela eran parte del "Consorcio del Noroeste" a la fecha de dicha relación contractual. Por lo tanto, sostuvo que solo restaba aplicar el derecho al presente asunto. En vista de lo anterior, asevera que la decisión recurrida se basó en el expediente y cumple con el estándar probatorio requerido de prueba clara, robusta y convincente.

Tras un examen minucioso de la totalidad del expediente ante nuestra consideración, concluimos *confirmar* la *"Resolución"* recurrida. Veamos.

Los planteamientos del recurrente sobre consideraciones reglamentarias de admisibilidad de prueba, presunciones y defensas afirmativas tratan de cuestiones normativas que se encuentran reguladas en las Reglas de Evidencia y en las Reglas de Procedimiento Civil de nuestro ordenamiento jurídico. Siendo así, es sabido que las Reglas de Evidencia no aplican a los procesos administrativos para no obstaculizar la naturaleza expedita y flexible de dichos procesos. Tan es así, que se reconoce la validez de una determinación administrativa que se fundamente solamente en prueba de referencia, siempre y cuando una persona prudente y razonable pueda descansar en ella para llevar a cabo sus negocios. Véase, *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1005 (2011); *Otero v. Toyota*, 163 DPR 716, 734-735 (2005). Similar trato le brinda nuestro ordenamiento jurídico a la aplicabilidad de las Reglas de

Procedimiento Civil, puesto que estas no aplican automáticamente a los procesos administrativos. Su aplicación está sujeta a los escenarios en que no sean incompatibles con la flexibilidad de dichos procesos y propicien una solución justa, rápida y económica. Véase, *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 840 (2021).

En vista de tal normativa, determinamos que la OEG no tenía la obligación jurídica de dilucidar los procesos administrativos a tenor de las disposiciones consagradas en las Reglas de Evidencia y en las Reglas de Procedimiento Civil. Independientemente de ello, las estipulaciones fácticas y documentales acogidas por las partes, así como la evidencia que obra en el expediente, fundamentan la procedencia de la sanción impuesta y derrotan las defensas y presunciones levantas por el recurrente. La prueba documental vertida en el caso es prueba suficiente de la ocurrencia de la violación ética en disputa. De la extensa prueba documental presentada, destacan por su pertinencia, documentos públicos consistentes en ordenanzas municipales y certificaciones expedidas por funcionarios con autoridad para ello, que gozan de suficiente confiabilidad para sostener de manera clara, robusta y convincente la sanción impuesta.

De otra parte, el recurrente sostiene que no procedía adjudicarse el caso de forma sumaria a favor de la OEG. Sobre el particular, aduce que sus defensas afirmativas no fueron refutadas por la OEG y que la única adjudicación que procede es la desestimación de la *"Querella."* No le asiste la razón. Conforme esbozado, las agencias administrativas tienen la facultad de resolver sumariamente los casos presentados ante sí. La referida adjudicación sumaria procede en los escenarios en que no exista controversia sobre los hechos materiales del caso y por ende la celebración de una vista evidenciaria resulte innecesario.

De un examen de los elementos fácticos de este caso se desprende la inexistencia de controversia sobre los hechos esenciales. Primero, no existe controversia en que el recurrente, en representación del Municipio de Isabela, y el señor Torres Rosado, entablaron una relación contractual

el día 1 de abril de 2021 a los fines de que el referido señor brindara servicios de consultoría al Municipio de Isabela. De igual modo, no está en controversia que las aludidas partes enmendaron el contrato de servicios el día 17 de mayo de 2021. Además, es un hecho incontrovertido que al momento de suscribirse los referidos contratos el recurrente y el señor Torres Rosado eran servidores públicos. El recurrente era alcalde de Isabela y el señor Torres Rosado legislador municipal de Aguadilla. A su vez, las partes estipularon una serie de documentos de gran relevancia para el asunto en cuestión. En particular, estipularon una certificación de pago a favor del señor Torres Rosado por la cantidad de $3,000.00 en consideración a los servicios que prestó al Municipio de Isabela. Asimismo, estipularon la existencia de la Ordenanza Núm. 29, Serie 2018-2019; la Ordenanza Núm. 27, Serie 2020-2021; la Ordenanza Núm. 11, Serie 1998-1999; y la Ordenanza Núm. 10, Serie 2015-2016.

En vista de lo anterior, surge con claridad la inexistencia de controversia sobre los hechos materiales del caso. Por lo cual, la cuestión umbral del litigio se reduce a una determinación jurídica sobre la interpretación, vigencia, aplicabilidad y obligatoriedad de las ordenanzas municipales y acuerdos vigentes al momento de efectuarse la relación contractual objeto de contienda.

Así pues, conforme esbozado, las ordenanzas municipales son legislaciones adoptadas por las legislaturas municipales. Estas forman parte de las fuentes de derecho de nuestro ordenamiento jurídico. Una vez aprobadas, solo podrán dejarse sin efecto mediante la orden de un tribunal competente, en virtud de legislación estatal o mediante otra ordenanza o resolución al efecto. 21 LPRA sec. 7012. En el presente caso, la Ordenanza Núm. 11, Serie 1998-1999, autorizó al alcalde del Municipio de Isabela a formar parte del "Consorcio del Noroeste." La referida ordenanza tuvo vigencia a partir del 23 de junio de 1999. Siendo así, jurídicamente dicha ordenanza mantiene su fuerza y vigor a menos que se cumpla con alguna de las instancias que extinguen sus efectos.

Por uso y costumbre, el Municipio de Isabela ratificó su participación en el "Consorcio del Noroeste" mediante la Ordenanza Núm. 10, Serie 2015-2016. En vista del expuesto marco doctrinal, esta última ordenanza tiene el mero efecto de reiterar la vigencia de un estado de derecho existente en virtud de la Ordenanza Núm. 11, Serie 1998-1999. Similar efecto reiterativo tuvo la Ordenanza Núm. 43, Serie 2020-2021, aprobada en fecha posterior a la relación contractual en cuestión. Ante tales hechos, por no derogarse las ordenanzas previas a la Ordenanza Núm. 43, Serie 2020-2021, y por el contrario reiterar sus efectos en virtud de esta, la interpretación resultante es que al momento de suscribirse los contratos en disputa el Municipio de Isabela era parte del "Consorcio del Noroeste."

Similar trato interpretativo se debe conceder al escenario particular del Municipio Aguadilla. Si bien la Ordenanza Núm. 29, Serie 2018-2019, autorizó el retiro de dicho municipio del "Consorcio del Noroeste," la Ordenanza Núm. 27, Serie 2020-2021, derogó su vigencia. Esta última ordenanza entró en vigor el día 18 de marzo de 2021. Con relación a su contenido, se desprende que el retiro del Municipio de Aguadilla del "Consorcio del Noroeste" no se llegó a implementar por la Junta de Alcaldes. Surge además de dicha ordenanza la intención inequívoca del Municipio de Aguadilla de permanecer en el referido consorcio.

La Ordenanza Núm. 27, Serie 2020-2021, no fue dejada sin efecto por alguna ordenanza posterior, mas bien fue ratificada por la Ordenanza Núm. 48, Serie 2020-2021, del 27 de mayo de 2021. Así pues, la Ordenanza Núm. 27, Serie 2020-2021, estaba en todo su vigor al momento de efectuarse la relación contractual de litigio. Por consiguiente, el Municipio de Aguadilla también era parte del "Consorcio del Noroeste" al momento de suscribirse dicha relación contractual.

Ante ello, la evidencia documental estipulada por las partes por sí sola fundamenta la participación de ambos municipios en el "Consorcio del Noroeste" a la fecha de efectuarse la relación contractual en cuestión. No obstante, del expediente ante nos surge evidencia relevante adicional, tales

como certificaciones y epístolas sobre reuniones del "Consorcio del Noroeste" que robustecen la referida realidad fáctica.[5]

De otra parte, el Código Municipal le delegó a los municipios el poder de crear consorcios y contratos. Una vez creado, el consorcio tendrá personalidad jurídica propia y separa del municipio. 21 LPRA sec. 7013. Además, la existencia de dicho consorcio se regulará a tenor de las disposiciones sobre sociedad según consagradas en el Código Civil. En el presente caso, antes de perfeccionarse la relación contractual en cuestión, los municipios de Isabela y Aguadilla, junto a otros municipios, suscribieron el "Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN)" en fecha de 5 de abril de 2018. Se desprende de la parte expositiva de dicho acuerdo, la intención de las partes contratantes de participar en el "Consorcio del Noroeste" al amparo de la autorización concedida por sus respectivas ordenanzas municipales vigentes.

A su vez, las referidas partes estipularon que el aludido acuerdo intermunicipal estaría en vigencia hasta que la Junta de Alcaldes lo "derogara o lo modificara." Conforme establece nuestro ordenamiento civil, una sociedad se extingue cuando vence el tiempo convenido o en su defecto cuando culmina la durabilidad del negocio, convivencia o vida de los socios o sobreviene alguna de las causas resolutorias. No surge del expediente ante nuestra consideración, que la Junta de Alcaldes haya utilizado su facultad resolutoria para dejar sin efecto el referido acuerdo. Por consiguiente, al momento de la relación contractual objeto de litigio el "Acuerdo Intermunicipal para Constituir el Consorcio del Noroeste (ALDLN)" estaba en vigencia y vinculaba a los municipios contratantes.

Superado el análisis relacionado a la adjudicación sumaria y a la participación de ambos municipios en el "Consorcio del Noroeste,"

---

[5] Véase, "Certificación 2022-IP-0054" del 25 de octubre de 2022, emitida por la Secretaria Municipal de Isabela, pág. 151-152 del "Índice de Apéndice;" Carta del 4 de marzo de 2021, suscrita por el Alcalde de Rincón y timbrada por la "Junta Local del Noroeste," pág. 158 del "Índice de Apéndice;" Misiva del 20 de mayo de 2021, suscrita por el Director Ejecutivo del "Área Local de Desarrollo Laboral Noroeste," pág. 159 del "Índice de Apéndice;" "Certificación REF. 2022-IP-0054/2022-IP-055," emitida el 15 de noviembre de 2022 por la Directora Ejecutiva del "Área Local de Desarrollo Laboral Noroeste," pág. 170 del "Índice de Apéndice."

pasamos a dilucidar los méritos de la imputación ética al amparo del Artículo 4.2 (b), *supra*. El precitado artículo lee como sigue:

> Un servidor público no puede utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o para una persona privada o negocio, cualquier beneficio que no esté permitido por ley. 3 LPRA sec. 1857a.

El presente caso cumple con todos los requisitos necesarios para declarar la validez de la infracción ética imputada al recurrente. Según expresamos, al momento de perfeccionarse la relación contractual en cuestión el recurrente era un servidor público que ocupaba el puesto de alcalde del Municipio de Isabela. Al amparo de las facultades de su cargo firmó y enmendó un contrato en representación del referido municipio. Mediante este, concedió un beneficio económico a un legislador municipal de Aguadilla, municipio que participaba junto al Municipio de Isabela del "Consorcio del Noroeste." Para la procedencia de la imputación ética, es meritorio mencionar que la relación contractual entre el legislador municipal y el Municipio de Isabela estaba vedada por el Código Municipal. Sobre el particular, el Artículo 1.023 del referido Código lee en lo atinente como sigue:

> **No podrán mantener relaciones de negocio o contractuales de clase alguna** con el municipio de cuya Legislatura Municipal sean miembros, **ni con ningún otro municipio con el que el municipio mantenga un consorcio** o haya organizado una corporación municipal o entidad intermunicipal**. Como excepción a lo dispuesto en este inciso, la Oficina de Ética Gubernamental podrá autorizar la contratación,** de conformidad con lo dispuesto en la Ley 1- 2012, según enmendada, conocida como "Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico", y los reglamentos adoptados en virtud de la misma. (Énfasis suplido). 21 LPRA sec. 7044.

En este caso, no se demostró que se haya solicitado una autorización de la OEG para suscribir el contrato objeto de litigio. Por lo tanto, el contrato en disputa se otorgó en contravención del Artículo 1.023, *supra*. Consecuentemente, el recurrente le concedió un beneficio al señor Torres Rosado que estaba prohibido por ley. Siendo así, infringió el Artículo 4.2(b), *supra*.

El estándar probatorio aplicable a este tipo de casos es el de prueba clara, robusta y convincente. El referido estándar se cumple cuando el

Juzgador queda convencido de que las contenciones fácticas son altamente probables y no meras conjeturas. Los hechos incontrovertidos que anteceden y las estipulaciones de las partes en unión a la prueba documental que obra en el expediente, establecen la procedencia de la sanción impuesta de conformidad al estándar de prueba clara, robusta y convincente. A la luz de lo anterior, *confirmamos* la *"Resolución"* recurrida.

**IV.**

Por los fundamentos expuestos, confirmamos la *"Resolución"* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones